UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| Jessica Long | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 16 CV 50060 |
| | ) | Magistrate Judge Iain D. Johnston |
| Nancy A. Berryhill, Acting | ) | |
| Commissioner of Social Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

This is an action challenging the administrative law judge's ("ALJ") denial of social security disability benefits to plaintiff Jessica Long. *See* 42 U.S.C. §405(g). Plaintiff claims that her chronic panic attacks, her fear of leaving the house, and her fear of large groups would prevent her from working full-time. The ALJ found that plaintiff's limitations were overstated and that she could work certain jobs involving no public interaction and only infrequent interaction with co-workers and supervisors. As explained below, this Court finds no basis for second-guessing that decision.

### BACKGROUND

Plaintiff filed her current applications for disability benefits on January 10, 2012. The ALJ held two hearings. At the first, on November 19, 2013, plaintiff's counsel gave an opening statement, arguing that plaintiff suffered from anxiety and depression with "varying diagnoses." R. 52. Counsel acknowledged that "[w]e do have work after the onset date," which counsel described was work as a telemarketer and plaintiff taking care of her mother, but counsel argued that these activities were "unsuccessful work attempts." R. 54.

---

[1] Nancy A. Berryhill has been substituted for Carolyn W. Colvin. Fed. R. Civ. P. 25(d).

Plaintiff testified that her anxiety problems were long-standing and that they caused her to drop out of school in the eighth grade. She had a hard time being around people and would "basically just not go" to school. R. 55.

The ALJ asked plaintiff about her work history. Plaintiff testified that, from roughly 2003 to 2005, she worked at Burger King where she was a crew leader in charge of six to eight people. R. 56 ("I assigned specific jobs for the employees to do, counted money for the drawers, and sometimes, I would open up the store or close it."). This was a full-time job. From around 2008 until 2010 (roughly two years), plaintiff worked as a telemarketer for a company called Heartland Introductions. She worked for five hours a night, five days a week. She read from a script and asked questions. R. 59 ("Basically, I had to ask them questions about what they liked to do for fun, what kind of person they were looking for, as to date, what things they weren't looking for."). In 2011, plaintiff took care of her mother who was ill. She helped her mother shower and get dressed, cleaned the house, and cooked her meals. She worked there every day, for five hours a day, for about five months. In 2012, plaintiff worked out of her home styling and cutting hair. She explained as follows:

> Well, I have a lot of—friend[s]—well, not a lot, but I'd say between three and six friends of my husband and I, and they would come to my home, and my husband would assist me in, like, doing highlights, dying, cutting, things like that because we have no income, and I—we had to do something to try and make the money. But that didn't last a very long because I—it was a lot of stress on me and my husband as well.

R. 60. She estimated that she did this work for five to eight months.

The ALJ asked plaintiff why she thought she could not work now in light of her work as a crew chief at Burger King. Plaintiff answered as follows:

> Now, I have a very hard time leaving the house to do things that are important. I am unable to go to places without somebody that I trust to be with me because I'm

> scared I'm going to panic, and there's nobody to be there to help me. I can't concentrate as to – I could then, and I think that's it.

R. 62-63. Plaintiff described her "average day" as follows:

> I wake up really early. I basically try and watch TV. That's kind of hard for me because I worry a lot, and a lot of things go through my mind to where I'm not even really watching the TV. I'm more, like, just staring at the walls the whole day. My husband does the cooking and cleaning because I can't concentrate, or I think that I'm not doing it right, or I just—I just—I feel I can't do it due to my anxiety. My panic attacks, they happen when I least expect it. I don't know whenever they're going to come on, and I'm basically terrified all day long that I'm going to have one because it feels like I'm going to have a heart attack and I can't breathe.

R. 63. Plaintiff estimated that she had four panic attacks a day, and that the attack would last "about 20 to 30 minutes."[2] R. 64. Plaintiff stated that "going into large groups of people" caused the panic attacks, although they sometimes also happened for no reason. R. 64. Plaintiff had not been hospitalized for any attacks.

Plaintiff estimated that she went out of the house three times a week to go to an anxiety therapy group and that she went with her husband to the grocery store about four times a week. She sometimes went to the anxiety group by herself. She explained as follows: "I go alone. It was hard for me to go at first, but I've gotten kind of close with Natalie [], and she's kind of helped me through some anxiety attacks that I've had during the group sessions." R. 68.

The ALJ asked plaintiff when she last used illegal drugs or alcohol. She stated that it was July 15, 2011 when she got her second DUI. She stated that she used drugs and alcohol to self-medicate, but that they did not help in the long run. She testified that she was more functional since quitting in 2011. Plaintiff also was asked about her children, and the fact that all of them were living elsewhere. One child was given up for adoption and another was given to a guardian.

---

[2] Later in her testimony, she was asked about how long she had been having panic attacks at the frequency of four a day. She stated that "[i]t's been about four years, maybe longer." R. 69. Given that the hearing was held in 2013, this would mean that the panic attacks were at this frequency level since at least 2009, when she was working as a telemarketer.

3

Her oldest daughter lived with the daughter's father. The only one of the children plaintiff saw regularly was her youngest daughter, who plaintiff saw about one hour a week.[3]

Plaintiff stated that she had tried various therapy techniques to deal with her panic attacks, but that she had not "really got any help out of [these techniques]." R. 76. Plaintiff was still going to group therapy.

A second hearing was held on June 23, 2014. This hearing was for the purpose of getting expert testimony. Dr. Michael Carney, a psychologist, testified at length. In general, he described his own opinions as being "wishy-washy" on several points because it was "a tough kind of judgement to make given the records," a concession plaintiff relies on now as a key argument for remand. R. 116. This testimony is considered in greater detail below.

On July 7, 2014, the ALJ issued a 22-page decision finding plaintiff not disabled. He found that she had the following severe impairments: "panic disorder without agoraphobia, social phobia, generalized anxiety disorder, substance abuse in remission, dependent personality disorder, schizoid personality disorder and borderline intellectual functioning." R. 23. The ALJ found that plaintiff did not meet any listings—specifically, under the paragraph B criteria, she had mild limitations in daily activities, and moderate limitations in social functioning and concentration. The ALJ found that plaintiff had the residual functional capacity ("RFC") to work a full range of work subject to the following limitations: "1-2 step tasks, routine work that stays the same day-to-day, no public interaction, and infrequent to occasional interaction with others, co-workers and supervisors." R. 26.

---

[3] Plaintiff's loss of custody of her children was apparently due to her ongoing drug abuse, her arrests, and her "domestic violence relationship." R. 857. The record refers to plaintiff being both a victim and perpetrator of this violence. *Id.* However, neither the ALJ, nor the parties, have focused much of their argument on these troubles.

4

**DISCUSSION**

Plaintiff's opening brief contains only one substantive argument heading, which is the overarching assertion that "The ALJ's Decision Was Not Supported by Substantial Evidence." Included within this broadly-framed argument are several smaller ones. The Court discerns two main arguments. First, plaintiff asserts that ALJ overlooked a "consensus of professionals" who believed that plaintiff "will not improve without much therapy," that she "suffers from anxiety and dependency issues," and that she "likely cannot work." Dkt. #11 at 8. Second, plaintiff asserts that the ALJ improperly relied on plaintiff's three post-onset (*i.e.* after March 2009) work activities. Plaintiff asserts that these two errors affected both the listings analysis and the RFC assessment. The Court is not persuaded that these arguments warrant a remand.

Plaintiff's "consensus" argument rests on selective evidence that provides support primarily for conclusions not in dispute. By using the term consensus, plaintiff gives the impression that all the medical professionals agreed with her theory of the case. But this is not so. Plaintiff's consensus rests on the opinions of three medical professionals: Dr. Carney, who testified at the second hearing; Dr. Valerie Bouchard, a psychologist who evaluated plaintiff at the request of DCFS in early 2013; and Katie Heisler, a counselor at Rosecrance who completed a Mental Capacity Assessment in March 2012. Putting aside for the moment whether these three opinions even support plaintiff's theory, a topic discussed below, the Court first notes that the record contains—and the ALJ relied on—the observations and opinions of *other* doctors in addition to these three. In particular, the ALJ summarized and relied on the statements of Dr. Syed Irfan, a psychiatrist who treated plaintiff in 2009-2010 (Ex. 1F); Dr. Mark Langgut, a psychologist who acted as a consultative examiner issuing a report in April 2012 (Ex. 5F); and

Dr. Marva Dawkins, a State agency psychologist who completed a Psychiatric Review Technique in May 2012 (Ex. 6F).

These three professionals offered opinions casting doubt on plaintiff's assertions or, at a minimum, showing that the claim of a consensus is overstated. Dr. Langgut administered various tests and diagnosed plaintiff with major depressive disorder and *moderate* anxiety with panic features. R. 451. He noted that plaintiff "*presented herself* as passive, allowing other[s] to complete most activities of daily living for her and generally refusing to engage in tasks such as cooking and cleaning." R. 449 (emphasis added). He also noted that plaintiff "expressed phobias of *mild intensity* regarding social situations and crowds." R. 450 (emphasis added). The ALJ summarized these findings in his report, and noted that Dr. Langgut's observations "go towards the type of work for which [plaintiff] is suited, not work preclusion." R. 36. In other words, Dr. Langgut's report supported the ALJ's finding that plaintiff could work certain types of jobs subject to qualifications (*e.g.* no public interaction) that were included in the RFC formulation.

Dr. Irfan treated plaintiff from approximately October 2009 until March 2010. The ALJ discussed Dr. Irfan's observations in several paragraphs, noting that Dr. Irfan diagnosed plaintiff with "generalized anxiety disorder, social anxiety disorder, depressive disorder, NOS, agoraphobia without panic disorder, and likely benzodiazepine dependency in June 2010." R. 35. Dr. Irfan was tapering plaintiff's anti-anxiety medications. He noted that plaintiff claimed to be nervous "in large groups, but still attended parties if there were people with whom she was familiar." *Id.* The ALJ also noted that Dr. Irfan's care was described as merely "routine" care. *Id.* In sum, Dr. Irfan's findings were further evidence that, although plaintiff had panic attacks and anxiety, she was not totally incapacitated in the way she claimed at the hearing.

Finally, the ALJ relied on Dr. Marva Dawkins, the State agency psychologist, who opined that plaintiff did not meet a listing or qualify as disabled. *See* Ex. 6F; R. 37-38. Dr. Dawkins rated plaintiff's limitations in daily activities as mild and her social functioning and concentration as both moderate—the same assessments the ALJ later adopted. Dr. Dawkins found plaintiff only partially credible, noting (among other things) that she "reports attending AA meetings five times a week during which she leaves home and is in the accompany of others." R. 465. In sum, plaintiff's omission of these three opinions undermines her consensus argument.

But even if the analysis were limited to only the three professionals plaintiff has chosen to highlight, it is not clear that there is a consensus on the critical issues. Plaintiff relies heavily on the testimony of Dr. Carney. The gist of plaintiff's argument is that Dr. Carney expressed doubt on various matters. On this point, plaintiff is correct. In particular, Dr. Carney stated that the assessment of plaintiff's social functioning, which is one of the four paragraph B criteria, was "difficult to appraise" and he seemed to believe that plaintiff's limitations fell somewhere "from moderate to marked." R. 104 ("I kind of hedge back and forth on that."). He stated that she had social anxiety, but noted that she still went to parties, but then noted that she "maybe" did so accompanied by people. He observed also that she was able to go to group therapy sessions. *Id.* However, as the Government points out, despite all this uncertainty, Dr. Carney only appeared to express doubt about whether plaintiff had "marked" limitations in the one category of social functioning, which means that, even accepting plaintiff's best arguments, she still would not be able to show marked difficulties in *two* of the paragraph B criteria.

Plaintiff also suggests that Dr. Carney was unsure about whether she met the paragraph C criteria. But here again, plaintiff is relying on ambiguous statements suggesting that Dr. Carney

7

was not sure, one way or another, on this issue. At best, plaintiff's argument is that this was a close call. This fact is confirmed by the way plaintiff in her own brief hedged this conclusion. *See* Dkt. #11 at 7 (concluding that "there *might be* **elements of** the C criteria present") (both bold and italics added for emphasis).

Plaintiff finally relies the following statement Dr. Carney made about plaintiff's absences: "I think there was a lot of truancy [in school] or absences, so my sense is that it would prevent her from *maybe* going to work *or not wanting to work*[.]" R. 113 (emphasis added). As the italicized portions suggest, however, Dr. Carney again waffled on the issue. Put differently, he never firmly opined that he thought plaintiff's absences would prevent her from working. On the whole, Dr. Carney's testimony contains numerous cross-cutting statements, some supporting plaintiff, others bolstering the ALJ's conclusion. It should be noted, finally, that Dr. Carney never suggested that there was a specific test or other approach that could be, or should be, applied to resolve the uncertainties he identified in his testimony.

The Court turns next to Dr. Bouchard, the second in plaintiff's consensus trio. Plaintiff picks out various observations from Dr. Bouchard's report, such as that plaintiff had "dependency issues," "exhibited poor judgment," and 'lacked progress despite therapy." Dkt. #11 at 8. But on the whole, Dr. Bouchard's testimony is even less helpful than Dr. Carney's.[4] As the ALJ noted, Dr. Bouchard found plaintiff's self-reports to be "suspect" in several ways. Dr. Bouchard specifically doubted plaintiff's claims about how long she was sober. R. 29 ("Her self-report about the length of her sobriety was also suspect.").[5] Dr. Bouchard rendered other opinions that undermine plaintiff's theory. She stated, for example, that she believed that plaintiff "was *not* afraid to leave her home." R. 30 (emphasis added). This conclusion is directly

---

[4] Dr. Bouchard's report, at 10 pages, is the longest one in the record, and the ALJ concluded that it provided the "most in-depth analysis" in the record. R. 34, 855-864.
[5] Dr. Bouchard is a psychologist and a certified alcohol and drug counselor. R. 864.

8

contrary to plaintiff's central contention—namely, that she had agoraphobia and was trapped in her home due to overwhelming fears. Dr. Bouchard, in fact, diagnosed plaintiff with panic disorder *without* agoraphobia. R. 863.[6]

The third professional plaintiff relies on is counselor Katie Heisler. Her opinion is the strongest in favor of plaintiff. Plaintiff relies primarily on Ms. Heisler's answers to a checkbox-style question. When asked how many absences on average plaintiff would have in a month, Ms. Heisler checked the box "4+." R. 444. This opinion, if accepted, would support plaintiff's claim of not being able to work. However, there was no consensus around this point. It is true, as noted above, that Dr. Carney made an ambiguous statement that plaintiff's absences "may" be a problem on the job, but he never settled upon an opinion nor stated clearly that plaintiff's absences would prevent her from working. Moreover, this is not a case where the ALJ ignored Ms. Heisler's opinion. The ALJ acknowledged it, but found it deserved only limited weight because it was based on plaintiff's self-reports, ones the ALJ separately found were not reliable.

In sum, only one of these professionals (Ms. Heisler, a counselor) offered an opinion clearly supporting plaintiff and one other (Dr. Carney) provided ambiguous testimony that perhaps indirectly supports plaintiff. This is not a consensus as plaintiff suggests. It is true that these doctors agreed that plaintiff had anxiety problems and panic attacks to some degree. But this point is not in dispute. The ALJ found that plaintiff's anxiety disorders were severe impairments and that she could only work a subset of jobs because of those impairments. Plaintiff also emphasizes that doctors seemed to agree that her therapy and medications had not led to as much progress as hoped for. Plaintiff assumes that this fact, if true, meant that she

---

[6] Another indication that there was not a clear medical consensus is that Dr. Irfan diagnosed plaintiff as having "agoraphobia without panic disorder" (R. 35, 380), which flips the terms in Dr. Bouchard's diagnosis and which is also another piece of evidence supporting the ALJ's conclusions that plaintiff's panic attacks were not as serious as she portrayed them.

should have been found disabled. But plaintiff has not filled in the missing link of explaining why this fact undermines the ALJ's rationale. The ALJ's decision does not rely in any significant way on an improvement narrative in which it was believed that plaintiff's problems would ameliorate in the near future. Instead, the ALJ assessed whether plaintiff could, at her current level of anxiety, work full-time.

Plaintiff's second principal argument for remand is that the ALJ improperly relied on three, post-onset work periods—specifically, plaintiff's work as a telemarketer, her hair-styling job out of her home, and the five-month period when she took care of her mother. Plaintiff makes two contentions about this work. The first is that it was improper for the ALJ to consider this work *in any respect* because it was not full-time, gainful work. The second is that, even if the ALJ in theory could consider this work, the ALJ gave it too much weight.

Plaintiff's first contention is moot because, in her reply brief, she properly and wisely concedes that the ALJ was permitted to consider this evidence. *See* Dkt. #17 at 2 ("there appears to be no *per se* rule that an ALJ must not consider part time work"). Indeed, the ALJ's consideration of plaintiff's part-time employment is overwhelmingly supported by the regulations and case law. 20 C.F.R. §404.1571; *Walker v. Astrue*, 11-107-JPG-CJP, 2011 U.S. Dist. LEXIS 145805, *20 (S.D. Ill. Aug. 19, 2011) ("it is proper to consider part-time work after the alleged onset of disability") (*citing Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008) ("[T]he fact that [the claimant] could perform some work cuts against his claims that he was totally disabled.")); *see also Goff v. Barnhart*, 421 F.3d 785, 792 (8th Cir. 2005); *Harris v. Barnhart*, 356 F.3d 926, 930 (8th Cir. 2004) (part time work may demonstrate ability to perform substantial gainful employment). As for the second contention, the Court is not persuaded that the ALJ committed any error in the way he considered this evidence.

10

Plaintiff argues that the ALJ failed to consider various counter-arguments relating to these three activities. Plaintiff highlights certain facts (for example, that these jobs were limited in duration or were done in the home) and argues that these qualifications undermine the probity of this evidence. But plaintiff has not argued that the ALJ failed to acknowledge these counter-arguments. For example, the ALJ acknowledged that plaintiff's hair-styling work took place in the home and was done for friends. Still, despite these caveats, the ALJ believed that this work showed "a measure of preserved concentration and focus." R. 23. As for the telemarketing job, the ALJ believed that this job showed that plaintiff "necessarily would have engaged in interpersonal engagement and frequent communication." *Id.* The ALJ also acknowledged these counter-arguments, by including several limitations in the RFC formulation, such as no public interaction. Plaintiff claims that she quit the telemarketing job due to stress, but this job was arguably more difficult than those consistent with the RFC formulation.

Plaintiff's other major criticism about these three post-onset stints is that the ALJ relied on them to the exclusion of all the other evidence. But this assertion overlooks the multiple other grounds upon which the ALJ relied. First, the ALJ also relied on plaintiff's *pre-onset* work activities. In particular, the ALJ noted that plaintiff worked at Burger King and that, significantly, she was a crew chief supervising six to eight other people. R. 31. Although these activities were before the alleged onset date, plaintiff testified that her social anxiety has existed since the eighth grade —*i.e.* before this job. Plaintiff has not alleged that there was any dramatic worsening since that time; if anything, she stated that her condition improved when she stopped drinking in 2011.

Second, as summarized above, the ALJ relied on numerous observations from the treating and consulting doctors, including Dr. Bouchard, Dr. Irfan, and Dr. Dawkins.

11

Third, the ALJ found that plaintiff made a number of inconsistent and exaggerated statements. *See* R. 22-23 (referring to various "discrepancies"). These inconsistencies are set forth throughout the ALJ's decision. As the Government notes, Plaintiff has not challenged these individual findings nor made any broader argument attacking the ALJ's overall credibility conclusion. In addition, the ALJ also noted that Dr. Bouchard and Dr. Langgut raised concerns about plaintiff's credibility.

Fourth, and related to the previous point, the ALJ noted that certain of plaintiff's activities were at odds with her claims of being unable to leave the house or interact with groups. The ALJ stated, for example, that plaintiff "goes to anxiety group alone"; that she sometimes takes the bus by herself; that she goes to parties; and that she was able by herself to move from Peoria back to Rockford. R. 26, 32-33.

In sum, as the Government notes, the ALJ cited both medical and nonmedical findings in support of the decision. This is substantial evidence. In her two briefs, plaintiff has raised criticisms and counter-arguments about specific conclusions the ALJ made, but the plaintiff has not pointed to any error in the process used by the ALJ to reach the decision, nor has plaintiff identified any lines of evidence that were ignored. Plaintiff's arguments focus instead on the weight that should be given to various pieces of evidence. However, in making these arguments, plaintiff has not indicated any new test that should be performed, nor has she asked that a second impartial expert be called. Ultimately then, plaintiff's case for a remand boils down to a generalized plea for this Court to merely "reweigh [the] evidence" and then "substitute [its] judgement for the ALJ's." *Alvarado v. Colvin*, 836 F. 3d 744, 747 (7th Cir. 2016). This is not a role this Court is permitted to play.

## CONCLUSION

For these reasons, plaintiff's motion for summary judgment is denied, the Government's motion is granted, and the decision of the ALJ is affirmed.

Date: April 21, 2017            By: _____
                                    Iain D. Johnston
                                    United States Magistrate Judge